IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| S.B., *et al.* | * | |
| Plaintiffs | * | |
| v. | * | Civil Action No.: 13-cv-01068-JFM |
| BOARD OF EDUCATION OF HARFORD COUNTY | * | |
| | * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION

The Defendant, the Board of Education of Harford County (the "Board"),[1] by its attorneys, Edmund J. O'Meally, Andrew G. Scott, and Pessin Katz Law, P.A., hereby file this Opposition to Plaintiffs' Motion for Sanctions for Spoliation ("Motion"). For the reasons discussed below, Plaintiffs' Motion should be denied in its entirety.

## I.    PRELIMINARY MATTERS.

Plaintiffs have filed their Motion contending that the Board improperly deleted electronically stored information ("ESI") and other documents, and that Plaintiffs have been prejudiced as a result. With regard to ESI generally, the Board, having produced thousands of pages of ESI in response to Plaintiffs' vague and belated requests for same, denies that it failed to produce any of the ESI requested by Plaintiffs. With respect to the alleged spoliation of ESI

---

[1] On September 23, 2014, Plaintiffs voluntarily dismissed with prejudice all of their claims against Defendants William Lawrence and Michael O'Brien. *See* ECF No. 72; *see also* ECF No. 74 (paperless Order approving dismissal with prejudice of Messrs. Lawrence and O'Brien). Consequently, the Board is the only remaining Defendant.

relating to former Defendant William Lawrence, the Board contends that, to the extent that certain records from Mr. Lawrence may have been deleted inadvertently from certain databases, they were nonetheless saved in other databases and produced to Plaintiffs months prior to the expiration of discovery and the filing of Plaintiffs' Motion.  With respect to non-ESI documents concerning the logs of Jeffrey Webster, a non-party paraeducator, the only portion of Mr. Webster's log noting any incident between S.B. and another student was retained and produced while other portions of the log that did not detail any of the events alleged in the litigation were discarded by Mr. Webster.  Since none of the acts of bullying alleged by Plaintiffs (with the exception of the single log entry) occurred during the period of time that Mr. Webster was shadowing S.B., the failure to retain the record of irrelevant log entries has no prejudicial effect upon Plaintiffs.

At the outset, <u>it is absolutely necessary to demonstrate the inaccuracy of the facts set forth in Plaintiffs' Motion</u>.  Indeed, virtually the *entire* "Statement of Facts" section on Pages 1 and 2 of Plaintiffs' Motion is inaccurate and unsupported by any evidence in the record.  This section of Plaintiffs' Motion is crucial because it is upon these facts that Plaintiffs' analysis regarding the relevance and extent of prejudice with regard to the alleged spoliation is dependent.  Although the Board does not wish to belabor the issue, it nevertheless believes it is essential to demonstrate to the Court the liberties Plaintiffs have taken in their Motion.

Plaintiffs assert that William Lawrence, who was formerly an Assistant Superintendent for the Board (and who was a named defendant in the instant lawsuit until Plaintiffs voluntarily dismissed him with prejudice in September 2014, *see* ECF Nos. 72 and 73, *after* the alleged spoliation at issue), "was intimately involved in all aspects of the present suit."  ECF No. 90-1 at 1-2.  As shown below, this assertion is not only completely unsupported but plainly inaccurate.

Plaintiffs assert that Mr. Lawrence "acted as the conduit between the Board and Aberdeen High School ("AHS"), where S.B. attended," and in support of their assertion cite to pages 27 through 30 of the deposition transcript of Joseph Schmitz, who at all times relevant has been the Executive Director of High School Performance for the Board.  *See* ECF No. 90-1 at 2. The testimony of Mr. Schmitz to which Plaintiffs cite, however, merely provides that Michael O'Brien (the Principal of AHS, and who was also a defendant in the instant lawsuit until Plaintiffs voluntarily dismissed him with prejudice at the same time that they dismissed Mr. Lawrence, *see* ECF Nos. 72 and 73) reports to Mr. Schmitz; that, until former Superintendent Robert Tomback's term expired (on June 30, 2013), Mr. Schmitz reported to Mr. Lawrence; and that since Dr. Tomback's departure, Mr. Schmitz reports directly to the current Superintendent.[2] Thus, although Mr. Lawrence was one individual among several in the chain of command between the former Superintendent and the Principal of AHS, there is no evidence that he "acted as a conduit" between the Board and AHS.  Moreover, to the extent Plaintiffs use the term "conduit" in an attempt to insinuate that Mr. Lawrence was directly involved in the affairs of AHS, that fact, as established below, is blatantly false.[3]

Of critical importance, Plaintiffs next assert that "Lawrence was in constant contact with AHS Principal Michael O'Brien ("O'Brien"), the administrative staff at AHS, and HCPS [*i.e.*, Harford County Public Schools] personnel regarding matters of school administration and policy,

---

[2] Dr. Tomback was initially a Defendant in his official capacity only but was dismissed from the suit by Order of this Court on September 30, 2013.  *See* ECF No. 35.  When Dr. Tomback's term as Superintendent expired, Mr. Lawrence similarly left the Board's employ.

[3] It is highly telling that Plaintiffs did not depose Mr. Lawrence despite having ample opportunity to do so, both before and after they voluntarily dismissed him with prejudice as a defendant in this case.  It is also highly telling that Plaintiffs' attempt to establish certain facts regarding Mr. Lawrence by citing to, at best, mildly relevant portions of Mr. Schmitz's deposition transcript instead of citing to Mr. Lawrence's Answers to Plaintiffs' Interrogatories.  Indeed, to the extent Plaintiffs may have done so because of alleged deficiencies in Mr. Lawrence's Answers, Plaintiffs never raised any such deficiencies until now (more than seven (7) months after being served with those Answers, *see* ECF 90-1 at 4 (wherein Plaintiffs admit that Mr. Lawrence served his Answers on June 2, 2014)), nor did Plaintiffs ever file a Motion to Compel with this Court.

including matters at issue in this case," and they again cite to Mr. Schmitz's deposition at 29:18 – 30:9 as support.  *See* ECF No. 90-1 at 2.  Mr. Schmitz did not testify to any such facts.  The portion of Mr. Schmitz's deposition transcript to which Plaintiffs cite merely states that he reported to Mr. Lawrence; that since Dr. Tomback's departure in June 2013 he reports directly to the current Superintendent; and that, "[i]n a given instance there might be another layer," meaning that Mr. Schmitz might inquire of another central office administrator before reporting to his superiors if presented with a concern of a specific nature with regard to which a certain administrator, such as Chief of Operations, may have particular expertise.  There is absolutely nothing in the record that demonstrates that Mr. Lawrence was in "constant contact with [Mr. O'Brien], the administrative staff at AHS, and [unnamed, it should be noted] HCPS personnel regarding matters of school administration, including matters at issue in this case."  In fact, the complete opposite is true.  *See* AFFIDAVIT OF WILLIAM LAWRENCE, attached as **Exhibit 1** at ¶ 3[4]; AFFIDAVIT OF MICHAEL O'BRIEN, attached as **Exhibit 2**, at ¶ 3.

Plaintiffs next assert that, "[f]or the majority of the time during which the events alleged in Plaintiff's Second Amended Complaint ("SAC") occurred, O'Brien did not communicate directly with the Board, but rather with Lawrence, who was both observer and participant in decisions made by O'Brien, including regarding Plaintiffs' case."  *See* ECF No. 90-1 at 2.  In support of that assertion, Plaintiffs again cite to Mr. Schmitz's deposition transcript at 29:18 – 30:9, which, as set forth above, is completely irrelevant to this factual assertion.  Plaintiffs also cite to Exhibit M of their Motion, which is a two-page string of emails which were written over the course of a single day in November 2012 between Mr. Lawrence, Jeffrey Fradel (Senior Manager of Staff and Labor Relations for the Board), Mr. Schmitz, and Mr. O'Brien, wherein

---

[4] As noted *supra* in Footnote 2, Mr. Lawrence left the employ of the Board on June 30, 2013.  That fact, coupled with Plaintiffs' dismissal of him with prejudice as a defendant in this case in September 2014, establish that he has no incentive to provide self-serving testimony in his affidavit, whether in his favor or in favor of the Board.

Mr. O'Brien inquires whether T.L. should be reassigned away from AHS because of various concerns (including the disappearance of two behavior referrals from S.B.'s file while T.L. was completing his practicum in the main office).[5]  To extrapolate from that singular string of emails on a single day more than two years ago that Mr. O'Brien regularly communicated with Mr. Lawrence regarding matters relevant to this case is disingenuous at best.

Plaintiffs next assert that "[p]art of Lawrence's job was to keep the Board informed as to what O'Brien and AHS staff were doing at AHS," citing yet again to Mr. Schmitz's deposition transcript at 29:18 – 30:9.  *See* ECF No. 90-1 at 2.  Plaintiff's assertion is again disingenuous at best.  At most Mr. Schmitz's testimony demonstrates that Mr. Lawrence was Mr. Schmitz's superior and Superintendent Tomback's subordinate.  It does not establish that Mr. Lawrence communicated with the Board at all, much less that he did so with regard to this case.

Plaintiffs next assert that "Lawrence was party and privy to (i) O'Brien's interactions with A.L.; (ii) S.B.'s treatment at the hands of other AHS students; and (iii) the retaliatory acts directed at T.L. that are alleged in the SAC."  *Id.*  Plaintiffs provide no citation whatsoever for those assertions.  *Id.*  Plaintiffs further assert that, "[i]n particular, Lawrence was involved with the decision leading to T.L. losing his practicum, the decision to remove T.L. from the summer school program, and the series of investigations and other impetuses to have T.L. removed from AHS entirely."  *Id.*  In support of those assertions, Plaintiffs again cite Exhibit M to their Motion—*i.e.*, the two-page string of emails dated November 2012 regarding Mr. O'Brien's inquiry as to whether T.L. should be reassigned away from AHS.  Thus, although Exhibit M is relevant to T.L.'s proposed reassignment (which, as noted above, never occurred), it does not support the assertion that there were a "series of investigations and other impetuses to have T.L. removed from AHS entirely," and it is wholly irrelevant to the assertions that Mr. Lawrence

---

[5] It is worth noting that it is undisputed that T.L. was never reassigned away from AHS.

"was involved with the decision leading to T.L. losing his practicum"[6] and "the decision to remove T.L. from the summer school program."

Lastly, Plaintiffs assert that "A.L. routinely communicated directly with Lawrence over the matters raised in this lawsuit. It must be assumed that A.L.'s emails to Lawrence spurred internal communications and discussions regarding a response (if any) by the Board, HCPS key personnel, AHS and key personnel, O'Brien and/or Lawrence." *See* ECF No. 90-1 at 2. Plaintiffs again provide no citation whatsoever for those assertions. *Id.* Even so, although the record is clear that Mr. Lawrence and A.L. occasionally communicated via email regarding certain issues (*e.g.*, Mr. O'Brien's appointment of himself as A.L.'s sole point of contact regarding non-special-education-related educational matters involving S.B. and the restriction imposed by Mr. O'Brien on A.L. requiring her to provide advance notice before visiting AHS),[7] there is no evidence in the record that Mr. Lawrence and A.L. "regularly" communicated regarding the bullying allegations or the resultant investigations conducted and discipline imposed by AHS staff. Moreover, Plaintiffs' assertion that certain facts "must be assumed" is without basis in law and directly in conflict with the voluminous record in this case, not to mention Mr. Lawrence's sworn testimony on the matter. *See* **Exhibit 1** at ¶ 4.

---

[6] It should be noted that, as set forth in the Board's Motion for Summary Judgment, it is undisputed that T.L. did not "lose" his practicum, which was a prerequisite to earning a master's degree in Administration/Athletic Director. *See* ECF No. 88-1 at ¶¶ 70 through 74. To the contrary, it is undisputed that although T.L. was not permitted to complete his practicum at AHS, he completed it with Ken Zorbach, the Supervisor of Athletics for the entire HCPS; that he received his master's degree; that the Board paid nearly $10,000 toward T.L.'s master's degree program tuition; and that T.L. received not one but two pay increases from the Board as a result of earning his master's degree. *Id.*

[7] It was these issues that were the basis of A.L.'s claims against Mr. Lawrence in the Complaint and First Amended Complaint and First Amended Complaint, *see* ECF Nos. 1 and 28, but those facts are now largely irrelevant insofar as A.L. voluntarily dismissed all of her claims. *See* ECF No. 72.

## II.    FACTS.

### A.  Facts Relating to the Discovery of Electronically Stored Information.

On September 30, 2013, this Court issued a Tentative Scheduling Order providing a deadline of October 16, 2013 for the parties to hold a conference regarding discovery of electronically stored information ("ESI").  *See* ECF No. 35-1 at 2.[8]  Counsel conferred by telephone on October 11, 2013.  *See* AFFIDAVIT OF EDMUND J. O'MEALLY, ESQUIRE, attached as **Exhibit 3** at ¶ 3; AFFIDAVIT OF ANDREW G. SCOTT, ESQUIRE, attached as **Exhibit 4** at ¶ 3.  At no time during that conference did Plaintiffs' counsel indicate that Plaintiffs intended to request electronically stored information ("ESI").  *Id.*

On October 17, 2014, this Court issued a Scheduling Order setting the discovery deadline at February 14, 2014.  *See* ECF No. 38 at 2.  On November 26, 2013, Defendants served Interrogatories and Requests for Production of Documents on Plaintiffs.  *See* DEFENDANTS' DISCOVERY REQUESTS, attached collectively as **Exhibit 5**.

On December 3, 2013, Plaintiffs' counsel filed a Motion to Withdraw as Counsel.  *See* ECF No. 39.  This Court granted that motion on January 7, 2014, and provided Plaintiffs until

---

[8] As background, on April 10, 2013, Plaintiffs S.B., then a minor child and 11th grade student who attended AHS, along with A.L. (S.B.'s mother) and T.L. (S.B.'s stepfather and an employee of the Board who at all times relevant has been assigned as a teacher at Aberdeen), sued the Board, Dr. Tomback, Mr. Lawrence, and Mr. O'Brien under a variety of federal and state theories in an attempt to recover damages and equitable relief for the alleged bullying of S.B. by various classmates between 2005 and 2013 and the Defendants' alleged responses to the alleged bullying. *See* ECF No. 1.  In response, the Defendants filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, in which they sought either the dismissal of all of Plaintiffs' claims or judgment in their favor on all of Plaintiffs' claims.  *See* ECF No. 14.  Plaintiffs filed an Opposition thereto, *see* ECF No. 17, but before the Defendants could file a Reply, Plaintiffs filed an Amended Complaint in July 2013.  *See* ECF No. 25-2.

The Defendants thereafter filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment with regard to Plaintiffs' Amended Complaint, in which they sought either the dismissal of all of Plaintiffs' claims or judgment in their favor on all of Plaintiffs' claims.  *See* ECF No. 26.  Plaintiffs filed an Opposition thereto, see ECF No. 31, and the Defendants filed a Reply, see ECF No. 34.  On September 30, 2013, this Court granted in part and denied in part the Defendants' motion, indicating that "it appear[ed] doubtful that plaintiffs can establish that the remaining defendants acted with "deliberate indifference" in connection with the bullying to which S.B. was subjected or that anyone retaliated against A.L. or T.L. for their advocating on behalf of S.B.," but the Court "would be more comfortable in deciding the merits of those claims after discovery has been conducted." *See* ECF No. 35.

February 6, 2014 to find new counsel.  *See* ECF No. 43.  Plaintiffs thereafter sought an extension

of time to find counsel, and this Court granted that request, setting the new deadline at March 27,

2014.  *See* ECF Nos. 46 and 47.[9]  Plaintiffs' current counsel entered their appearances on March

25 (Richard Volin) and April 9, 2014 (Tracy Rezvani).  *See* ECF Nos. 49 and 51.

On April 1, 2014, this Court held a conference call to discuss scheduling issues insofar as

the discovery deadline (February 14, 2014) had already passed.  *See* ECF No. 50.[10]  At that

juncture, the Defendants' discovery requests propounded in November 2013 were still

unanswered.  *See* **Exhibits 3 and 4**.  In preparation for that call, counsel for the parties held a

teleconference on March 31, 2014 to discuss discovery issues, in particular with respect to the

fact that Plaintiffs had yet to respond to the Defendants' Interrogatories and Request for

Production of Documents.  *Id.*  At no time during either the March 31st call between counsel or

the April 1st call with the Court did Plaintiffs' current counsel indicate that Plaintiffs intended to

request the production of any ESI.  *Id.*[11]  It was not until May 30, 2014, when in an aside in a

series of emails back and forth between counsel for the parties regarding a completely different

matter, that Plaintiffs' counsel first expressed an interest requesting ESI.  *See* MAY 30, 2014

EMAIL FROM TRACY REZVANI, ESQUIRE TO ANDREW SCOTT, ESQUIRE, attached as **Exhibit 6**, at

---

[9] In its Order, the Court granted Plaintiffs' thirty-day request which would have set the deadline for finding counsel at March 8, 2014, but the Court also expressly indicated that the deadline was extended to March 27, 2014.  *See* ECF No. 47.

[10] The Court issued a Scheduling Order on March 21, 2014, indicating that Plaintiffs were proceeding *pro se* even though Plaintiffs still had until March 27th to find counsel.  In any event, the Court issued a memorandum on April 17, 2014 memorializing the deadlines set during the April 1, 2014 conference call which had the effect of superseding all previous Scheduling Orders.  *See* ECF No. 53.

[11] Of note, in denying Plaintiffs' counsel's request during the April 1st conference call for leave to file a Second Amended Complaint in order to add new claims, the Court reasoned, *inter alia*, that Plaintiffs' current counsel was bound by the actions of Plaintiffs' prior counsel.  *See* **Exhibits 3 and 4**.

2. *This was nine days **after** Defendants' responses to Plaintiffs' discovery responses were due.*[12]
Defendants were nearly finished with their discovery responses, and in fact had to request an
extension in order to comply in good faith with Plaintiffs' broad discovery requests and the
voluminous responsive documents to those broad requests, which at that time numbered nearly
20,000 pages, most of which were the result of a voluntary ESI search the Board in good faith
ran on its servers using the last names of Plaintiffs as search terms.  *See* **Exhibits 3 and 4**.

Despite never having raised the issue of an ESI search until May 30, 2014 (*more than
seven months after the Court's deadline as set forth in its September 30, 2013 Scheduling
Order*), Plaintiffs' counsel objected to the scope of the ESI search the Board in good faith
voluntarily ran.  *See* June 5, 2014 Letter from Tracy Rezvani, Esquire to Defendants'
Counsel, attached as **Exhibit 8**.  That highly relevant fact notwithstanding, the Board responded
by indicating that it was not unwilling to broaden its ESI search terms in a reasonable fashion to
address Plaintiffs' concerns.  *See* June 6, 2014 Letter from Andrew Scott, Esquire, to
Tracy Rezvani, Esquire, attached as **Exhibit 9**, at 2.[13]

---

[12] Plaintiffs served separate Interrogatories and Requests for Production of Documents upon each of the then-four
Defendants on April 18, 2014.  *See* **Exhibits 3 and 4**.  Defendants' counsel received those discovery requests on
April 21, 2014, thus by Rule the deadline for responding was May 21, 2014.  *Id.*  Plaintiffs' counsel granted an
extension until May 30, 2014.  *See* May 21, 2014 Emails between Andrew Scott, Esquire and Tracy
Rezvani, Esquire, attached as **Exhibit 7**.

[13] Paradoxically, although Plaintiffs' counsel wanted the Defendants to run a broader ESI search, Plaintiffs' counsel
also objected to the Board's alleged production of irrelevant and duplicate documents, *see* **Exhibit 8** at 3, to which
the Board's counsel responded:

> [T]he so-called duplicates are the result of the fact that your client, AL, sent scores of emails to
> numerous HCPS employees (and often copied TL) over the course of several years, thus a search
> of those individuals' email accounts revealed in certain instances duplicate emails.  Although the
> substance of certain emails may be the same, the documents are not duplicates if the same email is
> produced from more than a single recipient.  We erred on the side of overproduction as opposed to
> underproduction in order to avoid not producing an email, for example, believing it was
> duplicative when in fact in may contain one message not contained in another otherwise duplicate
> email found in another employee's email account.  It should be noted that your production also
> contained many arguably duplicative documents for the same reason, but Defendants did not
> object.  With regard to allegedly irrelevant documents, we do not believe we produced any such
> documents.  Your discovery requests were especially broad (e.g., all documents relating in any

After several lengthy teleconferences between the parties in which the Board's information technology ("IT") professionals participated, Plaintiffs submitted proposed search terms for searches to be run on four servers maintained by the Board.  *See* ECF No. 67 (August 6, 2014 letter from Plaintiffs' counsel to Defendants' counsel).[14]  These terms were exceptionally broad and would, in the educated opinion of the Board's IT professionals, result in many tens if not hundreds of thousands of pages of documents, the vast majority of which would be completely irrelevant to Plaintiffs or the case.  *Id.* (August 11, 2014 letter from Defendants' counsel to Plaintiffs' counsel).  Defendants, relying on the expertise of the Board's IT staff, provided a detailed analysis of Plaintiffs' proposed search terms, including the terms which Defendants believed were reasonable and which they would agree to run.  *Id.*  Plaintiffs largely rejected Defendants' offer, and instead submitted revised proposed search terms, which Defendants rejected as overbroad.  *Id.* (August 25, 2014 letter from Plaintiffs' counsel to Defendants' counsel and August 27, 2014 letter from Defendants' counsel to Plaintiffs' counsel).

Not able to come to an agreement, Defendants invoked this Court's informal discovery dispute telephone call mechanism, and a telephone conference was held on September 4, 2014. *See* ECF No. 65.  <u>Of exceptionally significant note, Plaintiffs' counsel's letter to the Court in support of its position argued at length that a more expansive search was required in light of the fact that Mr. Lawrence's email file on the Board's server had been deleted and his laptop wiped</u>

---

way to AL, TL, or SB), especially considering the fact that TL is an HCPS employee, AL emailed many HCPS employees over a period of several years, and SB has been a student in the HCPS for many years.

*See* **Exhibit 9** at 2.

[14] Plaintiffs' August 6, 2014 letter (as well as Defendants' August 11th letter, Plaintiffs' August 25th letter, and Defendants' August 27th letter, discussed *infra* in this paragraph) were filed under seal as exhibits to the Defendants' September 3, 2014 letter to the Court (*see* ECF No. 65) in preparation for the discovery dispute teleconference with the Court, which was held on September 4, 2014.

clean upon his separation from employment with the Board in June 2013. *See* ECF No. 66 at 2.[15]

That argument notwithstanding, this Court adopted the Board's proposed search term parameters, with minor exceptions. *See* **Exhibits 3 and 4**.[16]

Plaintiffs thereafter filed a Motion for Reconsideration. *See* ECF No. 68; *see also* ECF Nos. 69 (Board's Opposition), 75 (Plaintiffs' Reply), and 76 (Board's Supplement to its Opposition, noting that the Board's third-party vendor had indicated that the second ESI search would result in nearly 52,000 pages of documents). On September 23, 2014, while Plaintiffs' Motion for Reconsideration was still pending, Plaintiffs voluntarily dismissed Mr. Lawrence and Mr. O'Brien from this case with prejudice without ever taking their depositions. *See* ECF No. 72. On October 8, 2014, this Court denied Plaintiffs' Motion for Reconsideration, reasoning that the Court was "remaining of the view that the discovery sought by plaintiffs to its proposed search terms is disproportionate to the matter in controversy." *See* ECF No. 79.

### B. **Facts Relating to the "Lawrence Materials."**

Mr. Lawrence served as Assistant Superintendent Curriculum, Instruction, and Assessment for the HCPS from July 1, 2009 to June 30, 2013. *See* **Exhibit 1** at ¶ 2. As such, Mr. Lawrence was responsible for general oversight of curriculum development and implementation, instructional delivery, and the assessment of student achievement for the Harford County Public Schools. *Id.* Mr. Lawrence was not involved in the day-to-day supervision of school principals or students, including Mr. O'Brien and S.B. *Id.* at ¶ 5. At most, Mr. Lawrence would receive reports from Mr. Schmitz, whose role was to supervise and

---

[15] As discussed above and below, Mr. Lawrence did, however, previously send copies of all emails regarding Plaintiffs and the subject matter of this litigation prior to his departure in June 2013, and all of the emails produced by Mr. Lawrence were produced to Plaintiffs' counsel as part of the discovery production. Moreover, emails from or to Mr. Lawrence regarding the subject matter of this litigation were retained in other preserved databases which were also produced.

[16] There is no transcript of the September 4, 2014 discovery dispute teleconference.

evaluate school principals, but such instances were extremely rare insofar as Mr. Schmitz only communicated with him about such matters if they involved issues with system-wide implications. *Id.* Consequently, Mr. Lawrence did not communicate often with Mr. Schmitz or Mr. O'Brien regarding the matters at issue in the instant action. *Id.*

Although Mr. Lawrence occasionally communicated with A.L. via email regarding various matters, those emails were almost exclusively regarding Mr. O'Brien's decision to make himself the sole point of contact for A.L. regarding all non-special-education-related educational matters relating to S.B. and to require A.L. to provide advance notice before visiting AHS, and then only after Mr. O'Brien had referred the matter to Mr. Schmitz, who in turn referred the matter to Mr. Lawrence. *Id.* at ¶ 6.[17] Mr. Lawrence did not delete the emails he exchanged with A.L. or others relating to the instant action. *Id.* at ¶ 7. Mr. Lawrence did not take notes, either by hand or by computer or any other means, regarding matters relating to the instant action. *Id.* at ¶ 8.

On April 12, 2013, Mr. Lawrence received a "litigation hold" letter instructing him not to destroy any documents—including electronic documents—relevant to the instant matter. *Id.* at ¶ 9. On April 16, 2013, Mr. Lawrence, realizing that he would be leaving the employ of the Board on June 30, 2013, sent all of the emails in his possession relevant to the instant action to Andrew G. Scott, Esquire, one of his attorneys in this matter (the "Lawrence Emails"). *Id.*; *see also* **Exhibit 4** at ¶ 7. Mr. Lawrence did not send any documents other than emails because no such documents ever existed. *See* **Exhibit 1** at ¶ 9.

On June 3, 2014, the Defendants served their respective Answers to Interrogatories and Responses to Requests for Production of Documents on Plaintiffs, along with more than 16,000 pages of documents, approximately 15,000 pages of which were the result of an ESI search run

---

[17] Of course, A.L. had possession of all emails Mr. Lawrence exchanged with her.

on the Board's servers despite Plaintiffs not having requested any ESI search.  *See* **Exhibit 4** at ¶ 9.  In reviewing those documents for privilege and confidential student information requiring redacting in compliance with the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g *et seq.* ("FERPA"), Defendants' counsel inadvertently did not send the Lawrence Emails.  *See* JULY 25, 2014 LETTER FROM ANDREW G. SCOTT, ESQUIRE TO TRACY REZVANI, ESQUIRE, attached as **Exhibit 10**.  Immediately upon discovery of this fact, Defendants' counsel produced the Lawrence Emails on July 3, 2014.  *Id.*

As a standard operating procedure, the Board's  IT department deletes the server files and "wipes clean" any Board-issued laptop computer when an employee leaves the employ of the Board unless it has received a litigation hold letter or instructions from the departing employee's successor instructing otherwise.  *See* AFFIDAVIT OF ANDREW MOORE, attached as **Exhibit 11**, at ¶ 3.  Although the Board's in-house counsel issued a litigation hold letter on April 12, 2013, he inadvertently did not issue that letter to the Board's IT department.  *See* AFFIDAVIT OF PATRICK SPICER, ESQUIRE, attached as **Exhibit 12** at ¶ 3.  Defendants' outside counsel for this case did not become aware of this fact until July 2014, at which time they immediately communicated it to Plaintiffs' counsel.  *See* **Exhibits 3 and 4**.  Because the Board's IT department had not received a litigation hold letter or instructions from Mr. Lawrence's successor to maintain Mr. Lawrence's materials as of Mr. Lawrence's separation of employment from the Board on June 30, 2014, it therefore deleted Mr. Lawrence's files on the Board's servers and wiped clean his laptop pursuant to its standard operating procedure, not pursuant to any intentional act to delete potentially relevant evidence in the instant litigation.  *See* **Exhibit 11** at ¶ 4.  The Board's IT department did not delete the server files of any other relevant individuals in the case, and thus the documents contained on those servers were subject to the second ESI search the Board

conducted pursuant to the terms this Court affirmed in its September 4, 2014 discovery dispute conference call.  *Id.*

### C.  Facts Relating to the Jeffrey Webster Logs.

At all times relevant, Jeffrey Webster has been an employee of the Board and assigned as a paraeducator at AHS.  *See* AFFIDAVIT OF JEFFREY WEBSTER, attached as **Exhibit 13**, at ¶ 2.[18] As a paraeducator, Mr. Webster's typical job duties include supervising students with disabilities, helping manage classroom behavior, and providing students with accommodations according to their respective Individualized Education Plans ("IEPs").  *Id.*  Between January 2013 and June 2013, Mr. O'Brien assigned Mr. Webster to accompany S.B. so that he could ensure S.B.'s safety and so that he would have an objective and reliable witness were additional alleged acts of bullying and/or harassment to occur.  *See* ECF No. 88-1 at 31-32, ¶ 49.[19]  Mr. O'Brien also assigned Mr. Webster to S.B. because he had received numerous complaints from parents of other students that S.B. had instigated incidents with their children only for their children to be disciplined when the incident escalated.  *Id.*  Mr. Webster was assigned to S.B.

---

[18] Paraeducators, also known as instructional assistants, are only required to hold a high school diploma; they are not required to hold a bachelor's degree or to have completed any college credits.  *See* AFFIDAVIT OF JEFFREY M. FRADEL, attached as **Exhibit 14**, at ¶ 3.  Paraeducators have no disciplinary or executive decision-making authority; instead, the position is exclusively one of support to teachers and staff.  *Id.*  During the 2012-2013 school year, paraeducators employed by the Board who had not earned any college credits earned a salary of between $17,389 and $26,302 depending on seniority; paraeducators with bachelor's degrees earned a salary of between $18,389 and $27,302 depending on seniority.  *See* NEGOTIATED AGREEMENT, attached as **Exhibit 15**.

[19] In their Motion, Plaintiffs assert that "[t]he selected paraeducator would be required to record incidents, verbal altercations, and the like, as O'Brien wanted to have facts in defense of AHS and HCPS when Plaintiffs' anticipated lawsuit was filed," and that "Valicia Beaty, the HCPS Special Education Chair, chose Webster for this task."  *See* ECF No. 90-1 at 7.  In support of those assertions, Plaintiffs cite to Mr. O'Brien's deposition testimony at "85-86.4" and Exhibit J, respectively.  *Id.*  The testimony to which Plaintiffs cite, however, provides that Mr. O'Brien's main reason for assigning Mr. Webster was "intervening and having something else in place to help [S.B.], have an adult who can tell the story behind whatever situation occurred.  It wasn't a , well, let's justify our behavior.  It was, let's put something in place, let's try something different.  You know, [A.L.] is frustrated.  [S.B.] is frustrated.  We're [*i.e.*, the AHS administration] is frustrated.  Other parents are frustrated."  Thus, Plaintiffs' citation to the record again does not support their assertions.  Similarly, Exhibit J does not support Plaintiffs' assertion that Ms. Beaty chose Mr. Webster; to the contrary it plainly shows that Mr. O'Brien chose Mr. Webster.  To the extent Plaintiffs somehow dispute this fact, it is worth noting that Plaintiffs did not depose Ms. Beaty, nor did they depose Mr. Webster.

from January 2013 to June 2013, *i.e.*, the end of S.B.'s junior year. *Id.* While assigned to S.B., Mr. Webster kept a log in which he detailed any notable incidents between S.B. and other students (the "Webster Log"). *See* **Exhibit 13** at ¶ 3. Valicia Beaty, who was the Special Education Department Chair for AHS during the 2012-2013 school year, was Mr. Webster's direct supervisor and thus reviewed the Webster Logs on a daily or weekly basis. *See* AFFIDAVIT OF VALICIA BEATY, attached as **Exhibit 16**, at ¶ 2.[20] Mr. O'Brien instructed Mr. Webster to report to any incidents of bullying and/or harassment involving S.B. directly to him. *See* **Exhibit 13** at ¶ 4.

During his time assigned to S.B., Mr. Webster only witnessed one (1) incident of alleged bullying or harassment of S.B. by other students. *Id.* at ¶ 5. That incident, which was reported to Mr. O'Brien by A.L. on January 15, 2013, allegedly occurred on January 4, 2013 during S.B.'s English and/or geometry classes. *Id.*; *see also* ECF No. 88-1 at 33-34, ¶ 54. Mr. O'Brien immediately asked S.B.'s English and geometry teachers, along with Mr. Webster, to provide an account of what occurred. *See* ECF No. 88-1 at 33-34, ¶ 54. Joshua Marx, S.B.'s English teacher, responded as follows:

> We had several groups working on a small poster that would be hung up around the room. . . . These posters, which appeared anonymously, were seen by other students for the purpose of getting information off of them. [Student 9] commented on [S.B's] poster as [S.B.] walked by. She did not know it was his poster, but said something belittling the writing on the poster. It was not directed at [S.B.], as she did not know it was his. [S.B.] reacted by stating that even if she didn't agree with what was on the poster, she did not have to make fun of it. . . . I intervened by separating them. [S.B.] then walked away momentarily. After a brief time, he left the room and stood in the hallway. I walked out to talk to him, asking him why he reacted the way he did. He told me that he was insulted by what she said about his poster. I told him that even if he did feel insulted, he did not need to respond to her comments. [S.B.] repeated that he felt compelled to say something. . . . I told [S.B.] to stand outside and cool off in the hallway, as there was only a few minutes left in the period.

---

[20] Ms. Beaty is no longer an employee of the Board, *see* **Exhibit 16** at ¶ 3, nor has she ever been a defendant in this case. Thus, she does not have an incentive to provide self-serving or dishonest testimony.

*Id.* Joshua Rupert, S.B.'s geometry teacher, stated:

> On the day in question, [S.B.] came into my class and said that he didn't think that he could come in to class because he had just had a situation with a girl by the name of [Student 9]. During [S.B.'s] period of the day, I have both [S.B.] and [Student 9]. [S.B.] did not go into any details about what had happened but I never thought that it was a situation of bullying. [Student 9] is a mild mannered, diminutive individual so my opinion was that they had some sort of disagreement and [S.B.] was upset about it. I gave [S.B.] the work that we would be completing that day and he and Mr. Webster went to a different location for the period. Ultimately, I think that [S.B.'s] mom came in to pick him up later on in that day. Had I thought there was definite bullying occurring I would have done something more dramatic than just sending him to a different spot for the period.

*Id.* Mr. Webster submitted his log for that date to Mr. O'Brien; his account was consistent with those of Mr. Marx and Mr. Rupert. *Id.* Based on the foregoing, Mr. O'Brien did not take any corrective action because he did not believe any was warranted based on the investigative findings. *Id.*

Aside from the January 4, 2013 incident, Mr. Webster did not witness (and hence did not document in his log) any other incidents of alleged harassment or bullying against S.B., thus he had no reason to make any reports or submit any portion of his log to Mr. O'Brien. *See* **Exhibit 13** at ¶ 5.[21] Aside from the January 4, 2013 incident, Ms. Beaty did not observe any descriptions or other evidence of bullying and/or harassment involving S.B. in the Webster Logs. *See* **Exhibit 16** at ¶ 4. Ms. Beaty never made copies of the Webster Log. *Id.* at ¶ 5. Mr. O'Brien, Ms. Beaty, and Mr. Webster never intended for the Webster Log as a whole to become part of S.B.'s student file. *See* **Exhibit 2** at ¶ 4; **Exhibit 13** at ¶ 6; **Exhibit 16** at ¶ 6. In June 2013 (*i.e.*,

---

[21] Of note, Plaintiffs only allege two incidents of bullying or harassment occurring between January 2013 and June 2013—i.e., the time during with Mr. Webster was assigned to S.B. *See* ECF No. 85 at 31-34. The first incident, which is discussed at length above, occurred on January 4, 2013. *See* ECF No. 85 at 32, ¶ 122. The second incident, again reported by A.L. to Mr. O'Brien, occurred on May 8, 2013 in the stairway in between classes, but Mr. Webster was not present. *Id.* at 34, ¶ 132; *see also* ECF No. 88-1 at 35-36, ¶¶ 56-57 (quoting email from A.L. to Mr. O'Brien in which A.L. reported the incident to Mr. O'Brien and wherein A.L. states that "Mr. Webster was not with [S.B.] during the incident"). Tellingly, upon investigating the incident Mr. O'Brien discovered that S.B.'s own friend admitted to inciting the incident, and written statements from both S.B.'s friend and S.B.'s girlfriend contradicted S.B.'s version of the events. *See* ECF No. 88-1 at 36, ¶ 57.

upon the conclusion of the 2012-2013 school year), not having received a litigation hold letter,

Mr. Webster discarded the Webster Log because it did not contain any entries regarding bullying

or harassment other than the January 4, 2013 incident, which, as discussed above, he previously

submitted to Mr. O'Brien, and thus he did not believe there was any reason to keep it. *See*

**Exhibit 13** at ¶ 7. Counsel for the Board did not learn that Mr. Webster had discarded the

Webster Log until December 2014, at which time they immediately informed Plaintiffs' counsel.

*See* **Exhibit 4** at ¶ 10; *see also* ECF No. 90-2 at 43.

    **D. <u>Facts Relating to the Protocols of the HCPS Information Technology Department.</u>**

    The Board contracts with a third-party vendor to store its backup electronic data. *See*

**Exhibit 11** at ¶ 5. With regard to file servers, all Board file servers are backed up each

weeknight to an offsite location hosted by Venyu where Venyu retains them for a total of ten

(10) business days. *Id.* On the eleventh day Venyu deletes the oldest backup set from its system.

*Id.* Thus, if a document is not manually deleted by an employee, it will continue to remain on

the server, and will therefore continue to be backed up by Venyu in perpetuity. *Id.*

    With regard to email servers, all Board email servers are also backed up each night of the

week to an offsite location hosted by Venyu where Venyu retains them for a total of two (2)

days. *Id.* On the third day Venyu deletes the oldest backup set from its system. *Id.* Thus, if an

email is not manually deleted by an employee, it will continue to remain on the server, and will

therefore continue to be backed up by Venyu in perpetuity. *Id.*

    The Board also has in-house email retention capabilities within the email system. *Id.* at ¶

6. Emails that Board employees do not delete (regardless of whether received or sent) remain on

the Board's server in perpetuity. *Id.* Emails that Board employees manually delete are stored by

the email server for thirty (30) days, after which time they are deleted from the Board's servers

(and thus they are not backed up by Venyu).  *Id.*  Thus, as long as a Board employee does not manually delete an email, it will remain in existence in perpetuity.  *Id.*

The Board does not have the capability of altering its backup system with Venyu for individual employees; it may only do so with regard to all of its approximately 5,000 employees.  *Id.* at ¶ 7.  To have Venyu retain all of the Board's server backups indefinitely would be prohibitively expensive.  *Id.*[22]

## III.   STANDARD OF REVIEW.

### A.  Court's Authority.

The Fourth Circuit defines spoliation as the "destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001).  "[A] court's authority to levy sanctions on a spoliator ultimately derives from two main sources."  *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 505 (D. Md. 2009).  "First, there is the court's inherent power to control the judicial process and litigation, a power that is necessary to redress conduct which abuses the judicial process."  *Id.* (citations and internal quotation marks omitted).  "Second, if the spoliation violates a specific court order or disrupts the court's discovery plan, sanctions also may be imposed under Fed. R. Civ. P. 37."  *Id.* at 506.

---

[22] It is worth noting that, in the "Statement of Facts" portion of Plaintiffs' Motion in which they address the Board's destruction protocols, Plaintiffs cite a singular example of the damage allegedly done because of the Board's protocols.  Plaintiffs assert that "the email communicating to T.L. that he had been removed from the 2013 summer program position, a removal T.L. alleges was retaliatory in nature (SAC ¶131), cannot be located and is deemed 'not responsive' instead.  *See* Ex. L."  *See* ECF No. 90-1 at 8-9.  As an initial matter, it is undisputed that Mr. O'Brien, not anyone else, made the decision not to select T.L. for the summer school physical education position in the Summer of 2013.  *See* ECF No. 85 at 33, ¶ 131 (alleging in Second Amended Complaint that "T.L. was removed from the summer position of teaching [Science and Math Academy] Physical Education by Mr. O'Brien").  Second, and perhaps more importantly, Plaintiffs actually produced the email at issue to the Board and used it as a deposition exhibit at Mr. O'Brien's deposition.  *See* TRANSCRIPT OF MICHAEL O'BRIEN DEPOSITION, attached as **Exhibit 17** at 145:17 – 147:4; 183:4-15, including Exhibit 20 to O'Brien Deposition (middle email showing Mr. Lewis forwarded T.L. an email from Mr. O'Brien indicating that T.L. had not been chosen to teach summer school course).

"The court's inherent authority arises 'when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process.'" *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 517 (D. Md. 2010) (citing *United States v. Shaffer Equip. Co.,* 11 F.3d 450, 462 (4th Cir. 1993)).  As Judge Grimm has explained, "the court's inherent authority *only* may be exercised to sanction 'bad-faith conduct,' and 'must be exercised with restraint and discretion.'"  *Id.* at 518 (quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)).  "Thus, the court relies instead on statutory authority or rules when applicable."  *Id.*

### B.  <u>Proof of Sanction-Worthy Spoliation.</u>

In the Fourth Circuit, in order to prove spoliation that warrants a sanction, the moving party must show that:

> (1) The party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Id.* at 520-21.

### i.  **Duty to Preserve.**

This Court views a party's duty to preserve through the lens of "reasonableness" and "proportionality."  *Id.* at 522.  A party's duty to preserve "is neither absolute, nor intended to cripple organizations."  *Id.*  As Judge Grimm has explained, "the scope of preservation should somehow be proportional to the amount in controversy and the costs and burdens of preservation."  *Id.* at 522-23 (further explaining that "Fed. R. Civ. P. 26(b)(2)(C) cautions that all permissible discovery must be measured against the yardstick of proportionality").  Although

"[i]t generally is recognized that when a company or organization has a document retention or destruction policy, it is obligated to suspend that policy and implement a litigation hold to ensure the preservation of relevant documents once the preservation duty has been triggered, . . . a litigation hold might not be necessary under certain circumstances, and reasonableness is still a consideration." *Id.* at 524 (citations and internal quotation marks omitted).

"[T]he duty to preserve evidence relevant to litigation of a claim is a duty owed to the *court*, not to a party's adversary." *Id.* at 525 (emphasis in original).  This "is a subtle, but consequential, distinction," and "[a] proper appreciation of the distinction informs the Court's decision regarding appropriate spoliation sanctions." *Id.* at 526.  As such, "[w]here intentionally egregious conduct leads to spoliation of evidence but causes no prejudice because the evidence destroyed was not relevant, or was merely cumulative to readily available evidence, or because the same evidence could be obtained from other sources, then the integrity of the judicial system has been injured far less than if simple negligence results in the total loss of evidence essential for an adversary to prosecute or defend against a claim." *Id.*  Applying those principles, Judge Grimm has explained:

> [C]ertain sanctions make no logical sense when applied to particular breaches of the duty to preserve. For example, an adverse inference instruction makes little logical sense if given as a sanction for negligent breach of the duty to preserve, because the inference that a party failed to preserve evidence because it believed that the evidence was harmful to its case does not flow from mere negligence— particularly if the destruction was of ESI and was caused by the automatic deletion function of a program that the party negligently failed to disable once the duty to preserve was triggered. The more logical inference is that the party was disorganized, or distracted, or technically challenged, or overextended, not that it failed to preserve evidence because of an awareness that it was harmful. In short, matching the appropriate sanction to the spoliating conduct is aided by remembering to whom the duty to preserve is owed.

*Id.*

### ii. Culpable State of Mind.

In the Fourth Circuit, some degree of fault is required for a court to impose some form of sanctions, ranging from bad faith, willfulness, gross negligence, or ordinary negligence. *Id.* at 529. "Each case will turn on its own facts and the varieties of efforts and failures is infinite." *Id.*

"'Negligence,' or 'culpable carelessness,' is the failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation," and is "contrasted with conduct that is intentionally, wantonly, or willfully disregardful of others' rights." *Id*. (citation and internal quotation marks omitted). "Gross negligence, which is something more than carelessness, differs from ordinary negligence only in degree, and not in kind." *Id.* Whether conduct amounts to gross negligence instead of ordinary negligence will likely depend upon the unique circumstances of the case. *See id.* Willful conduct "is equivalent to intentional, purposeful, or deliberate conduct." *Id.* at 530. "Conduct that is in bad faith must be willful, but conduct that is willful need not rise to bad faith actions." *Id*. Specifically, "bad faith requires destruction for the purpose of depriving the adversary of the evidence." *Id*. (citation and internal quotation marks omitted).

### iii. Relevance of Lost Evidence and Resulting Prejudice.

In deciding whether and to what degree to assess sanctions, courts conduct a balancing analysis, looking to the conduct of the alleged spoliator and the degree of prejudice suffered by the opposing party as a result, which necessarily requires an analysis of the relevance of the evidence lost. *See id.* at 531-32. "In the context of spoliation, lost or destroyed evidence is 'relevant' if a reasonable trier of fact could conclude that the lost evidence would have supported the claims or defenses of the party that sought it." *Id.* at 531 (citation and internal quotation mark omitted). "It is not enough for the evidence to have been sufficiently probative to satisfy

Rule 401"; rather, "the absence of the evidence must be prejudicial to the party alleging spoliation of evidence." *Id.* at 531-32 (adding that spoliation causes prejudice when "the party claiming spoliation cannot present evidence essential to its underlying claim"). "The burden is on the aggrieved party to establish a reasonable possibility, based on concrete evidence rather than a fertile imagination, that access to the lost material would have produced evidence favorable to his cause." *Sampson*, 251 F.R.D. at 179-80. "Generally, courts find prejudice where a party's ability to present its case or to defend is compromised." *Victor Stanley*, 269 F.R.D. at 532.

Although the relevance of evidence is presumed if the spoliator's conduct was willful as defined above, "[n]egligent or even grossly negligent conduct is not sufficient to give rise to the presumption," and thus the moving party bears the burden of proving the relevance of the evidence at issue. *Id.* Moreover, even "[w]here there is a presumption, the spoliating party may rebut this presumption by showing that the innocent party has not been prejudiced by the absence of the missing information." *Id.* (citation and internal quotation marks omitted).

### C. <u>Appropriateness of Sanctions.</u>

"While a district court has broad discretion in choosing an appropriate sanction for spoliation, the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Id.* at 533 (citation and internal quotation marks omitted).

#### i. Dispositive Sanctions.

In order to impose dispositive sanctions, courts in the Fourth Circuit must "'be able to conclude either (1) that the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, *or* (2) that the effect of the spoliator's conduct was so prejudicial that it substantially

denied the defendant the ability to defend the claim." *Id.* at 534 (adding that "this Court has not terminated a case where a spoliator acted in bad faith, absent a showing of substantial prejudice"). Dispositive sanctions "should be avoided if a lesser sanction will perform the necessary function." *Silvestri*, 271 F.3d at 590.

### ii. Adverse Inference Jury Instructions.

A lesser but still severe sanction is an adverse inference jury instruction, which "informs a jury that it may draw adverse inferences from the loss of evidence, or the destruction of evidence, by assuming that failure to preserve was because the spoliator was aware that the evidence would have been detrimental." *Victor Stanley*, 269 F.R.D. at 535 (citation and internal quotation marks omitted). In the Fourth Circuit, the imposition of this sanction requires willful conduct—i.e., conduct that is more than negligent or grossly negligent but need not rise to the level of bad faith. *Id.* at 536. "An adverse inference about a party's consciousness of the weakness of his case, however, cannot be drawn merely from his negligent loss or destruction of evidence; the inference requires a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction." *Vodusek v. Bayliner Marine Corp.,* 71 F.3d 148, 156 (4th Cir. 1995).

"The court must also consider relevance and prejudice." *Id.* (citing *Vodusek,* 71 F.3d at 156 ("To draw an adverse inference from the absence, loss or destruction of evidence, it would have to appear that the evidence would have been relevant to an issue at trial and otherwise would naturally have been introduced into evidence.").

### iii. Attorney's Fees and Costs.

Attorney's fees and costs are a lesser sanction designed to compensate the complaining party for any reasonable additional expenses incurred as a result of the spoliator's conduct. *See*

*Victor Stanley*, 269 F.R.D. at 536.  "This Court will award costs or fees in conjunction with a spoliation motion as an alternative to a harsher sanction; if further discovery is necessary due to the spoliation; or in addition to another sanction, in which case the award may be for 'reasonable expenses incurred in making the motion, including attorney's fees,' or also for the cost of investigating the spoliator's conduct."  *Id.* (citing and quoting *Goodman,* 632 F.Supp.2d at 524).

### D.  <u>Timeliness of Motion for Sanctions for Spoliation.</u>

"Fed. R. Civ. P. 37 governs most motions for discovery sanctions, but it does not contain any specific reference to the timing of the filing of a motion seeking spoliation sanctions." *Goodman*, 632 F. Supp. 2d at 506.  "Courts considering this issue have identified a number of factors that can be used to assess the timeliness of spoliation motions," the first two of which are of particular relevance to the instant case:  "[f]irst, key to the discretionary timeliness assessment of lower courts is how long after the close of discovery the relevant spoliation motion has been made," and "[s]econd, a court should examine the temporal proximity between a spoliation motion and motions for summary judgment."  *Id.* at 506-07.   In articulating the second factor, this Court in *Goodman* cited several cases, including:  (1) *Glenn v. Scott Paper Co.,* Civ. A. No. 92–1873, 1993 WL 431161, at *17 n. 3 (D.N.J. Oct. 20, 1993), wherein a spoliation argument used to defend a summary judgment motion was deemed untimely, as the plaintiff did not raise any concerns "during the discovery phase or bring them to the attention of the magistrate judge"; and (2) *Ferrone v. Onorato,* No. 05–303, 2007 WL 2973684, at *10 (W.D. Pa. Oct. 9, 2007), wherein the Court ruled that the plaintiff's spoliation argument should have been made in an "appropriate discovery motion," not in an "opposition to summary judgment [motion]." *Goodman*, 632 F. Supp. 2d at 507.[23]

---

[23] It is worth noting that Plaintiffs filed their Motion four (4) days after the Board filed its Motion for Summary Judgment.  *See* ECF Nos. 88 and 90.

"The lesson to be learned," this Court has explained, "is that there is a particular need for these motions to be filed as soon as reasonably possible after discovery of the facts that underlie the motion." *Id.* at 508. "The least disruptive time to undertake this is *during* the discovery phase, not after it has closed." *Id.* (emphasis in original); *see also Ziemkiewicz v. R+L Cleaners, Inc.*, 996 F. Supp. 2d 378, 391-92 (D. Md. 2014) (reiterating the principle that "[t]here is a particular need for these motions to be filed as soon as reasonably possible after discovery of the facts that underlie the motion," and ruling that a plaintiff's spoliation motion was untimely because "[m]oving for spoliation sanctions as part of a motion for summary judgment, when discovery has closed . . ., is not 'as soon as reasonably possible'").

## IV.    ARGUMENT

The Board does not dispute that it had a duty to preserve the Lawrence Materials and the Webster Log and that those materials were lost as a result of the Board's IT department and Mr. Webster not having been issued litigation hold letters. Plaintiffs are nevertheless not entitled to sanctions because they failed to file their Motion regarding the Lawrence Materials in a timely fashion and because there was no prejudice to the Plaintiffs as a result of the lost documents. Moreover, even assuming the timeliness of Plaintiffs' Motion, the Lawrence Materials were produced to Plaintiffs in July 2014; the only relevant entry in the Webster Log was produced to Plaintiffs; and Plaintiffs' assumption as to what was contained in the Lawrence Materials and Webster Log is nothing more than impermissible speculation. Furthermore, even if the Court were to conclude that the Lawrence Materials and Webster Log are relevant and warrant sanctions, the adverse inference sanctions sought by Plaintiffs are impermissibly dispositive insofar as they seek to satisfy the *prima facie* elements of each of their claims. Such sanctions are not only completely unreasonable and disproportionate to the matter at issue, but have no

basis in law.  Lastly, Plaintiffs' request for attorney's fees as a result of having to spend time to "piece together information" is without merit because Plaintiffs were not forced to review any documents they would not have otherwise had to review, and to the extent Plaintiffs have reviewed many documents in this case, that fact is the sole result of Plaintiffs' exceptionally broad discovery requests, the scope of which ultimately had to be confined by a ruling of this Court.

**A.** **Plaintiffs' Motion with regard to the Lawrence Materials Should Be Denied as Untimely.**

It is undisputed that Plaintiffs became aware on July 3, 2014 of the Board's inadvertent deletion of Mr. Lawrence's server files and wiping clean of his laptop computer.  *See* ECF No. 90-1 at 4.[24]  Plaintiffs, however, did not file their Motion until more than six (6) months later, which was more than six (6) weeks after the close of the extended discovery period, and which was after the Board filed its Motion for Summary Judgment.  This Court, in the cases cited above in Section III.D, has indicated that sanctions motions must be filed "as soon as reasonably possible after discovery of the facts that underlie the motion," and has on more than one occasion denied as untimely sanctions motions filed after the close of discovery and after the alleged spoliator has filed a summary judgment motion.  This case warrants the same result.

Plaintiffs will no doubt argue in their Reply, as they implicitly did in their Motion, that the Board induced them into delaying by assuring them that the discovery produced—including the materials obtained from the second ESI search (the terms of which were resolved in the Board's favor on September 4, 2014 by this Court)—would permit them to "piece together a significant portion of the deleted emails from and to Lawrence, by reconstructing emails from and to other HCPS employees."  *See* ECF No. 90-1 at 5.  It is undisputed, however, that

---

[24] Nonetheless, all of the ESI stored by Mr. Lawrence were retained by him prior to his departure, forwarded to Defendants' counsel, and produced to Plaintiffs' counsel.

notwithstanding the fact that the Board had already produced all of the Lawrence Materials in July 2014, the Board produced the documents obtained from the second ESI search on November 6, 2014, and that thanks to the Board's counsel's efforts at "de-duplication," the number of pages of documents produced was reduced from approximately 52,000 down to approximately 2,500 pages.  *See* NOVEMBER 6, 2014 LETTER, attached as **Exhibit 18**; *see also* ECF No. 90-2 at 2-3, ¶¶ 12-14.[25]  Nevertheless, Plaintiffs never deposed Mr. Lawrence and did not file their Motion until nearly two (2) months after their receipt of the manageably-sized second ESI search production.

In short, Plaintiffs failed to file their Motion as reasonably close to the discovery of the deletion of the Lawrence Materials as possible.  The time to do so was during discovery, not six weeks after its close, and certainly not after the Board filed its Motion for Summary Judgment.

### B.   The Lawrence Materials and Webster Log Are Not Relevant.

Even if this Court were to rule that Plaintiffs' Motion was timely with regard to the Lawrence Materials, Plaintiffs are not entitled to sanctions because the Lawrence Materials and the Webster Log are not relevant as that term is defined in the spoliation context.   "In the context of spoliation, lost or destroyed evidence is 'relevant' if a reasonable trier of fact could conclude that the lost evidence would have supported the claims or defenses of the party that sought it."  *Victor Stanley*, 269 F.R.D. at 531 (citation and internal quotation mark omitted).  "**It is not enough for the evidence to have been sufficiently probative to satisfy Rule 401**"; rather, "**the absence of the evidence must be prejudicial to the party alleging spoliation of**

---

[25] Of course, the reason the number of documents obtained before the Board's counsel's "de-duplication" and elimination of documents for irrelevance numbered approximately 52,000 was because of the exceptionally broad terms and parameters of the second ESI search.  Indeed, as noted by the Board's IT staff, *see* ECF No. 67 (August 11, 2014 letter), had Plaintiffs had their way and the Court ruled in favor of their search terms and parameters, the number of pages of documents would have numbered well over one hundred thousand, and the burden of reviewing those documents for privilege, FERPA-protected information, and "de-duplicating" them on the basis of irrelevance would have been solely borne by the Board.

**evidence.**  *Id.* at 531-32 (emphasis added) (adding that spoliation causes prejudice when "the party claiming spoliation cannot present evidence essential to its underlying claim").

Although a Court may presume the relevance of evidence based on a showing of a party's intentional or willful conduct, that presumption is rebuttable, and should not arise in the instant case.  *Victor Stanley*, 269 F.R.D. at 532 (noting that "[w]here there is a presumption, the spoliating party may rebut this presumption by showing that the innocent party has not been prejudiced by the absence of the missing information").   If however, the Court finds the spoliator's conduct merely negligent or grossly negligent, the moving party bears the burden of proving relevance as that term is defined in the spoliation context.   *Id.*

Turning to the instant matter, it is clear that the Board did not intentionally delete evidence known to be relevant to Plaintiffs' case.  In fact, Mr. Lawrence sent all of the emails in his possession relevant to the action to the attorneys for the Board shortly after the initial Complaint was filed in April 2013 and before he left the Board's employ in June 2013.  Quite simply, he produced nothing else because no other documents existed.  Although the Board's IT department inadvertently deleted Mr. Lawrence's server files and wiped his laptop clean upon his retirement a few months later, those actions were performed pursuant to standard operating procedure, not any willful attempt to destroy evidence.  Similarly with regard to the Webster Log, it is undisputed that there was only one alleged incident of bullying/harassment with regard to which Mr. Webster was present; that his log entries regarding that incident (which turned out to be completely unfounded, it should be noted) were produced to Plaintiffs; and that Mr. Webster discarded the Webster Log at the end of his assignment to S.B. because it did not contain any other relevant entries regarding bullying or harassment.   Accordingly, it cannot

reasonably be argued that the Board knew that there was more relevant evidence in the Webster Log and that its willful conduct resulted in its destruction.

Moreover, if this Court concludes that the Board's conduct was negligent or grossly negligent, Plaintiffs have failed to satisfy their burden of proving that the Lawrence Materials and Webster Log were relevant as that term is defined because Plaintiffs have offered nothing but mere speculation as to the contents of those documents—a basis which this Court and others within the Fourth Circuit have consistently held is insufficient as a matter of law.  *See, e.g., Sampson*, 251 F.R.D. at 179-80 ("The burden is on the aggrieved party to establish a reasonable possibility, based on concrete evidence rather than a fertile imagination, that access to the lost material would have produced evidence favorable to his cause."); *E.I. Du Pont de Nemours & Co. v. Kolon Indust., Inc.,* 803 F. Supp. 2d 469, 498 (E.D. Va. 2011) (noting that the moving party must prove relevance "by offering probative evidence, not the hyperbole of argument"); *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 299 F.R.D. 502, 523 (S.D. W.Va. 2014) (explaining that "speculative or generalized assertions that the missing evidence would have been favorable to the party seeking sanctions are insufficient").[26]

Lastly, Plaintiffs have not sufficiently proven that they have been prejudiced by the loss of the Lawrence Materials and Webster Log.  This is not a case in which the sole piece of material evidence was destroyed, or even one where specific allegations of Plaintiffs' claims

---

[26] This Court and others within the Fourth Circuit have found a lack of relevance in cases with similar facts to the instant case.  *See, e.g., Sampson*, 251 F.R.D. at 178-83 (denying motion for sanctions on the reasoning that one of the individuals whose email account was at issue testified that he did not use email often, another individual did not use email at all, and the defendants already produced emails from the limited number of people to whom the individuals whose accounts were lost would have communicated, and concluding that "it would be sheer speculation to conclude that there were any emails which were lost or destroyed and which contained relevant information, let alone evidence favorable to plaintiff's case"); *Digital Vending Servs. Intern., Inc. v. Univ. of Phoenix, Inc.*, No. 2:09CV555, 2013 WL 5533233, at *6 (E.D. Va. Oct. 3, 2013) (finding that the party alleging spoliation failed to prove that the potential evidence on a lost thumb drive was relevant because the moving party "only offered speculation regarding the rest of the thumb drive's contents," and concluding that,"[s]ince there is no definitive proof of the thumb drive's contents, Defendants cannot show that its contents are relevant to their claims or defenses").

cannot be proven without evidence contained in the lost materials.  To the contrary, the Board has produced all relevant evidence in its possession and in the possession of Mr. Lawrence and Mr. Webster, and thus Plaintiffs have not been prejudiced by the Board's IT department's deletion of Mr. Lawrence's server files and wiping clean of his laptop *after* Mr. Lawrence produced all documents in his possession to his attorneys, nor have Plaintiffs been prejudiced by Mr. Webster's discarding of the Webster Log *after* he produced the only relevant portion of it.

In conclusion, the Lawrence Materials and Webster Log are not relevant as defined in the spoliation context, and even if they were, Plaintiffs have not been prejudiced as required by their destruction.  Consequently, Plaintiffs are not entitled to sanctions.

### C.   **Even if Plaintiffs Are Entitled to Sanctions, They Are Not Entitled to Adverse Inference Instructions or Any Significant Attorney's Fees.**

Even if this Court were to conclude that the destroyed Lawrence Materials and Webster Log are relevant, that Plaintiffs have been prejudiced, and therefore Plaintiffs are entitled to sanctions, Plaintiffs are not entitled to adverse inference instructions because the Board did not act willfully and because such sanctions would be wholly disproportionate to the spoliation at issue.  To be entitled to an adverse inference instruction, Plaintiffs must demonstrate that the Board "knew the evidence was relevant to some issue at trial and that [the Board's] willful conduct resulted in its loss or destruction."  *Vodusek*, 71 F.3d at 156; *see also Victor Stanley*, 269 F.R.D. at 536 (stating that the imposition of an adverse inference instruction requires willful conduct—i.e., conduct that is more than negligent or grossly negligent but need not rise to the level of bad faith); *Genuine Dubmax, Inc. v. Greektown LLC*, No. SAG-11-0812, 2012 WL 1664067, at *3-4 (D. Md. May 10, 2012) (explaining that willfulness requires "intentional or deliberate conduct resulting in spoliation").

Here, it is undisputed that the Board's IT department deleted the Lawrence Materials pursuant to its standard operating procedure because it inadvertently had not yet received a litigation hold letter.  The IT department therefore did not willfully destroy the Lawrence Materials with any intent as to the content or usefulness of those materials to this case. Similarly, it is undisputed that Mr. Webster produced the only relevant entry in the Webster Log before discarding that log because, inadvertently, he too had not at that time been issued a litigation hold letter.  Thus, his actions cannot be construed as willful.  Consequently, Plaintiffs have not met their burden to be awarded adverse inference instructions—whether at summary judgment or at trial.

Moreover, the adverse inference instructions Plaintiffs seek are wholly disproportionate to the matter at hand because they are essentially dispositive insofar as they seek to satisfy the *prima facie* elements of each of their claims.  *See, e.g., Ethicon*, 299 F.R.D. at 522 ("When making this assessment [of the appropriate sanction to impose], the court should take pains neither to use an elephant gun to slay a mouse nor to wield a cardboard sword if a dragon looms. Whether deterrence or compensation is the goal, the punishment should be reasonably suited to the crime.  A measure of the appropriateness of a sanction is whether it restores the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.") (internal citations and quotation marks omitted).  This Court, however, has clearly stated that such sanctions are only permissible where (1) the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, or (2) the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim.  *Victor Stanley*, 269 F.R.D. at 534.  None of these circumstances exist in this case.

Lastly, Plaintiffs are not entitled to attorney's fees, and even if this Court were to conclude that they are in order to impose a symbolic penalty on the Board for its failure to promptly issue litigation hold letters to its IT department and Mr. Webster, such an award should be minimal.  The award of such fees are permissible "in conjunction with a spoliation motion as an alternative to a harsher sanction; if further discovery is necessary due to the spoliation; or in addition to another sanction, in which case the award may be for 'reasonable expenses incurred in making the motion, including attorney's fees,' or also for the cost of investigating the spoliator's conduct." *Victor Stanley*, 269 F.R.D. at 536.  Here, Plaintiffs did not incur any fees by having to investigate the Board's conduct.  Moreover, further discovery would be not only fruitless with regard to documents created or maintained by Messrs. Lawrence and Webster, but also unreasonable in light of this Court's September 4, 2014 ruling in favor of the Board with respect to the scope of the second ESI search.  Furthermore, although Plaintiffs argue that they were required to spend more time than they otherwise would have reviewing the documents produced by the Board in order to "piece together" suspected gaps in the evidence as a result of the destruction of the Lawrence Materials and Webster Log, Plaintiffs' argument is without merit because Plaintiffs were not forced to review any documents they would not have otherwise had to review.  Indeed, had Plaintiffs successfully persuaded this Court as to the scope of the second ESI search, Plaintiffs would have had to review many thousands more documents at their own expense.

## V.     CONCLUSION.

For all of the reasons above, the Board of Education of Harford County respectfully requests that this Court deny Plaintiffs' Motion for Sanctions for Spoliation, and grant such other and further relief as it deems appropriate.

Respectfully submitted,

/s/ (filed electronically)

_____

Edmund J. O'Meally
Federal Bar No. 04910
PESSIN KATZ LAW, P.A.
901 Dulaney Valley Road, Suite 400
Towson, Maryland   21204
Tele:  (410) 339-6757
Fax:  (410) 832-5654
eomeally@pklaw.com

/s/ (filed electronically)

_____

Andrew G. Scott
Federal Bar No. 29257
PESSIN KATZ LAW, P.A.
901 Dulaney Valley Road, Suite 400
Towson, Maryland   21204
Tele:  (410) 339-6744
Fax:  (410) 832-5627
ascott@pklaw.com

COUNSEL FOR THE BOARD OF EDUCATION OF
HARFORD COUNTY

1185104-1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 18th day of February, 2015, a copy of the foregoing

Opposition to Motion for Sanctions for Spoliation was filed in the United States District Court

(Northern Division) and electronically served upon all counsel of record through the Court's

CM/ECF system.

/s/ (filed electronically)

_____

Andrew G. Scott